UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEBORAH WHITE,

       Plaintiff,

v.

TELCOM CREDIT UNION,

       Defendant.

_____/

Case No. 11-12118

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [19]**

This employment dispute comes before the Court on Defendant's motion for summary judgment. Plaintiff Deborah White was terminated from Defendant Telcom Credit Union on May 18, 2010. On May 13, 2011, she filed a complaint alleging that Defendant violated her rights under (1) the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-2645, when it both interfered with her FMLA rights and retaliated against her when she sought to enforce those rights; (2) Michigan's Persons With Disabilities Civil Rights Act, Mich. Comp. Laws § 37.1202(1), when it disciplined and terminated her because of her disability; and (3) Michigan's public policy when it wrongfully terminated her in retaliation for her attempt to enforce her FMLA rights. Defendant's motion argues that it is entitled to summary judgment on each of these claims.

For the reasons discussed below, Defendant's motion is GRANTED IN PART and DENIED IN PART. It is GRANTED as to Plaintiff's "wrongful termination" in violation of Michigan public policy claim, and is DENIED as to Plaintiff's PWDCRA and FMLA claims.

I.      **Facts**

The facts are disputed.  First, Plaintiff's version.

Plaintiff began working for Defendant Telcom in March 2003 as a member service specialist in the call center.  (Def.'s Mot, Ex. A, Pl.'s Dep. at 10, 21-22.)  She received a few verbal and written discipline warnings in 2004, 2005, and 2006, all related to tardiness and absenteeism.  (Def.'s Mot., Ex. B.)  After 2006 and up until immediately before her termination in May 2010, Plaintiff received no discipline warnings.  She received consistently good annual reviews, including the most recent which was completed in March 2010, just two months before her termination.  (Pl.'s Resp., Ex. 1, 3/1/10 Employee Appraisal.)

Defendant's call center is located on the first floor of a two-story building.  It is an open area next to the financial service area and not open to the public.  (Def.'s Mot., Ex. F, Lang Dep. at 14.)  This is where Plaintiff and other member service specialists were located while handling all calls into Defendant Telcom Credit Union.  (Pl.'s Dep. at 21-24.)  Jane LeSage, Plaintiff's supervisor, also worked in the call center, just two desks away from Plaintiff's desk.  This location allowed Ms. LeSage to answer employee questions, provide training, and answer calls.  (Def.'s Mot., Ex. E, LeSage Dep. at 7-8; Pl.'s Resp., Ex. 2, Pl.'s Aff. at ¶ 23.)[1]  Ms. LeSage was responsible for all discipline of call center employees.  She would bring any discipline matter to the attention of Human Resources and generally sat in on employee disciplinary meetings between Human Resources and the employees she

_____

[1]The Court does not consider any facts in Plaintiff's Affidavit that are inconsistent with or contradicted by her deposition testimony.

2

supervised.  Although generated by Ms. LeSage, both verbal and written warnings were documented in writing by Human Resources.  (LeSage Dep. at 12-14.)

### A. Plaintiff's Ankle Injury and Resulting Disability

In August 2007, Plaintiff was in a car accident and suffered a severe ankle injury. (Pl.'s Aff. at ¶ 2.)  Linda Hockney, Defendant's Vice President of Human Resources at that time, communicated with Plaintiff during her extended FMLA/personal leave.  (Def.'s Mot., Ex. I, 2007-2008 correspondence.)  Plaintiff had one ankle surgery in August 2007 and another in early 2008.  Following each surgery, Plaintiff was required to be off her feet for around two weeks and then had several weeks of physical therapy.  After the August 2007 surgery, Plaintiff returned to work in October 2007 but found that she needed more time off to recover and ultimately required another surgery.  So, Plaintiff was off work from November 2007 through March 2008.  During this entire time, Plaintiff received short-term disability benefit payments from CUNA.  (Pl.'s Aff. at ¶¶ 3-4; Pl.'s Dep. at 91-94.)

Since January 2008, Dr. Adelman has been Plaintiff's treating physician with regard to her left ankle.  (Pl.'s Aff. at ¶¶ 5-6.)  Although she was able to perform her job when she returned to work in March 2008, Plaintiff testified that, because of her ankle injury, she would have to get up and walk around every 30 to 45 minutes, would have to keep her leg elevated on a stool, and sometimes because of swelling had to wear her slippers at work. (Pl.'s Dep. at 37, 87, 95-96; Pl.'s Aff. at ¶¶ 10-11.)   From March 2008 through her termination in May 2010, Plaintiff testified that, because of her injured left ankle, she experienced problems with swelling, blood circulation, falling, not being able to lift, not being able to stand for long periods of time, difficulty walking up stairs, walking in general (had a limp), and could no longer run.  (Pl.'s Dep. at 95-97; Pl.'s Aff. at ¶ 13.)  Her ankle

3

injury substantially limited several of her major life activities, including standing, running, walking, lifting, pushing, and sitting, and Plaintiff's doctor told her that the limitations caused by her ankle injury were permanent – that Plaintiff had recovered 70% to 80% and was likely to have some permanent disability to the left ankle.  (Pl.'s Aff. at 10-13; Dr. Adelman Dep. at 24-29.)

### B.  Employer's Awareness of Plaintiff's Disability

Because of her ankle disability, Plaintiff had a handicapped license plate.  From March 2008 until her termination on May 18, 2010, Plaintiff parked in Defendant's handicapped parking spot, right outside the employee entrance.  Other employees parked much further away.  (Pl.'s Aff. at ¶ 15.)  Defendant's CEO, Thomas Reagan, often greeted Plaintiff as she was getting in and out of her car parked in the handicapped spot.  (Pl.'s Aff. at ¶ 15.)  The same is also true of Craig Larson, Defendant's Vice President of Lending and Ms. LeSage's manager.  (Pl.'s Aff. at ¶ 16; Lang Dep. at 26.)  Plaintiff avers that she also had a conversation with Mr. Larson and told him that she could not walk up and down stairs and had to take the elevator.

Ms. Lang is the manager of Defendant's Human Resources Department.  Although Ms. Lang denies that she knew Plaintiff had an ankle problem or handicap (Lang Dep. at 19), Plaintiff testified that Ms. Lang questioned her in the coffee room about how long ago she had suffered her ankle injury.  Plaintiff also testified that Ms. Lang asked her on one occasion why she parked in a handicapped space.  Shortly thereafter, Plaintiff was alerted that a police officer was in Defendant's parking lot checking out the back of her car, verifying whether she had a handicapped license plate.  While the police officer was checking out her car, Plaintiff observed Ms. Lang looking out an upstairs office window.

4

(Pl.'s Dep. at 79, 83, 85-87; Pl.'s Aff. at ¶¶ 19-20.)  Defendant's Employee Handbook requires employees to wear shoes at all times, and Plaintiff avers that she had explained to Ms. Lang that she frequently had to wear slippers to work because her ankle swelled so much that she could not wear shoes.  (Pl.'s Aff. at ¶ 18; Pl.'s Resp., Ex. 4, Employee Handbook at 41.)

Plaintiff's immediate supervisor, Ms. LeSage testified that she was aware of Plaintiff's ankle injury, was aware that Plaintiff parked in a handicapped spot, was aware that Plaintiff was still in physical therapy, was aware that Plaintiff had continuing difficulties with her ankle and needed to elevate it occasionally but confirmed that those difficulties did not interfere with her job performance.  (LeSage Dep. at 15-17.)  Plaintiff avers that Ms. LeSage was also aware that her ankle often swelled and made it necessary for her to work in slippers rather than shoes.  Ms. LeSage was also aware that, because of Plaintiff's ankle swelling, Plaintiff would put her phone on "do not disturb" so she could get up and walk around a little every 35 to 40 minutes each day to relieve her ankle swelling.  (Pl.'s Dep. 95-96.)  Ms. LeSage kept records of the amount of time each call center employee placed her phone on "do not disturb," and Plaintiff had to explain to Ms. LeSage that she did this when she got up to walk and relieve her ankle swelling.  (Pl.'s Aff. at ¶¶ 21-23.)

## C.  Plaintiff's Increased Problems With Ankle and Potential Surgery

Plaintiff testified that in late winter and early spring 2010, her ankle condition worsened.  She experienced increased pain, swelling, and falling because her ankle was not performing as it should.  (Pl.'s Dep. at 35, 37-38, 51.)  Plaintiff saw Dr. Adelman, her treating physician, on March 15, 2010.  His notes report that she was there that day "due to about four weeks duration of increased pain to the ankle."  (Def.'s Reply, Ex. O, 3/15/10

notes.)  Plaintiff told Dr. Adelman that she felt 80% healed, had plateaued, and had more good days than bad.  (*Id.*)  Dr. Adelman recorded his impressions from his examination: "chronic ankle instability," "anterior ankle impingement syndrome," "history of traumatic ankle injury," and "early posttraumatic arthritis, left ankle."  (*Id.*)

On May 10, 2010, Plaintiff had a follow-up visit with Dr. Adelman.  His notes reveal that Plaintiff had some complaints of "cramping type tenderness to the medial ankle that does extend to the calf.  She states that it is painful enough to where she needs to stop and exercise and then it does feel better.  This has been ongoing now for the past four plus weeks and has been worsening." (*Id.*, 5/10/10 notes.)  Dr. Adelman's impressions from his examination were that Plaintiff was experiencing "pain in the limb," "cramping of lower extremity," and "rest pain type syndrome."  (*Id.*)  He educated Plaintiff on her "diagnosis and treatment options." (*Id.*)  He noted that he was "concerned with some of the symptoms she was describing" and was "going to send her for a venous duplex Doppler to lower extremity to rule out a clot or a reflux or a Baker cyst" and was going to "send her for [an] anterior Doppler ABI and TBI." (*Id.*)  He discussed the ultrasound with Plaintiff, told her that she needed to get this testing done that day, wrote her a script, and sent her directly to the second floor of the Orthopedic Institute of Michigan to have the testing done.  He told her that he would see her after the testing was done, and if one of the tests came back positive, they will contact the hospital and "proceed appropriately." (*Id.*)

At his deposition, Dr. Adelman testified that Plaintiff came to him in May 2010 with cramping and edema (swelling) to the leg and his exam focused on those complaints.  (Dr. Adelman Dep. at 11.)  He was concerned about a blood clot and possible surgery.  (*Id.* at 13.)  When asked if he contemplated further surgery on Plaintiff's ankle, Dr. Adelman

6

testified that "[s]urgery . . . was always possible in any patient, you know, potentially if there – if the conservative means continue to fail." (*Id.* at 14.) Based on his notes, however, he denied that he told Plaintiff in May 2010 that she needed surgery on her ankle. (*Id.* at 13-14, 18.) On cross-examination, Dr. Adelman clarified that, although not in his notes, he could have discussed ankle surgery with Plaintiff in March or May 2010.

> There's a lot more discussion on stuff than is usually reflected in a note, so, I mean, there's a strong possibility. If she said we did, I mean, I wouldn't be – I wouldn't doubt myself, and say, "No, we absolutely didn't." Because I know, you know, people ask on some further treatment options that maybe we're not doing at that time, a lot of my notes are focused on what we're doing at that time, maybe what we're going to be doing for the next four weeks, not what we're going to be doing in potentially, you know, six months.

(*Id.* at 31-32.) He admitted that he did not document in his notes every conversation that he had with a patient otherwise he'd "be dictating all day." (*Id.* at 34.) When asked if, after Plaintiff's May 10, 2010 visit with him, "she was in a position to know that she needed a Family Medical Leave for surgery at that time," Dr. Adelman responded that:

> If we had discussed it, you know, even though it's not documented, she may have looked into that, I'm sure.

(*Id.* at 35-36.) He repeated that he could not remember the details of his conversation with Plaintiff on her May 10, 2010 doctor visit. (*Id.* at 36.)

Despite his lack of specific memory of discussions he had with Plaintiff in 2010, Dr. Adelman acknowledged that Plaintiff suffered from a permanent disability to her left ankle:

> Whatever she was doing pre injury . . . she described that she was not doing at this point in time. . . . Anything prolonged. Any prolonged standing, walking. Obviously she wasn't running. You know, anything on your feet. Pushing, pulling, even sitting for too long in a dependent position where the legs can swell.

(Dr. Adelman Dep. at 24-25, 26-32.)

7

Plaintiff ultimately had additional surgery on her ankle in February 2011.  She testified that she did not do so earlier because she was depressed after being fired and wanted to get stronger before she agreed to the surgery.  (Pl.'s Dep. at 52-57.)

### D.  Plaintiff Inquires About FMLA Time and Short-Term Disability

In April or early May 2010, Plaintiff had several discussions with Ms. LeSage and Ms. Lang where she told them that she would probably have to have another surgery on her left ankle, that she would need to take time off from work, and that she would like to go on short-term disability like she did the last time she was on leave for her ankle injury.  (Pl.'s Dep. at 37, 65.)  When Plaintiff informed Ms. LeSage, she referred Plaintiff to Ms. Lang in Human Resources.  (Pl.'s Dep. at 65.)

Plaintiff requested time off from work because she knew that she would have to have surgery because of the way her ankle was performing and because her condition was getting worse.  (Pl.'s Dep. at 35, 37, 59.)  She testified that Dr. Adelman told her that she probably would have to have surgery again but first he needed certain tests done.  (Pl.'s Dep. at 35-36, 38.)  Plaintiff identified the test as an MRI but in fact it was the Doppler tests Dr. Adelman ordered on May 10, 2010.  Despite Dr. Adelman's directions to have the Doppler tests he ordered done that day, the tests were scheduled for May 25, 2010. Plaintiff returned to work after her May 10, 2010 appointment and requested the day off as either a personal or vacation day.  (Pl.'s Dep. at 34-35; Pl.'s Resp., Ex. 3, 5/25/10 and 5/20/10 Dr. orders.)  Plaintiff told Ms. LeSage that she did not know exactly when the surgery would be scheduled but it would have to be done.  (Pl.'s Dep. at 50-51, 58-59.) Plaintiff was aware that the Employee Handbook required her to alert management at least

30 days before a potential leave.  (Pl.'s Aff. at ¶¶ 24-25; Pl.'s Resp., Ex. 5, Employee Handbook at 33.)

On May 3, 2010, Plaintiff had also informed Ms. LeSage that she might need to work part-time for four weeks so she could arrange home care for her mother-in-law.  Plaintiff explained to Ms. LeSage that she might not need this time but was requesting the FMLA forms for the doctor to fill out just in case she had to take the time.  (Pl.'s Dep. at 49, 58.) Ms. LeSage emailed Ms. Lang in Human Resources about Plaintiff's FMLA request and informed her that LeSage had told Plaintiff to contact Ms. Lang.  (Def.'s Mot., Ex. K, 5/3/10 email.)  Later that day, Plaintiff got an email from Ms. Lang asking her to come to her office. She did, and they discussed the possibility of Plaintiff taking intermittent FMLA leave and working part-time for four weeks to either care for her mother-in-law or find someone who could care for her long-term.  (Pl.'s Aff. at ¶¶ 26-27; Pl.'s Dep. at 39.)

In that same meeting, Plaintiff testified that she also told Ms. Lang that her ankle was getting worse and her doctor had told her that she probably needed another surgery.  (Pl.'s Dep. at 37-39.)  Plaintiff asked about the availability of short-term disability while she was off for the surgery and recuperation.  Ms. Lang told her that this leave would also have to be FMLA, not short-term disability.  (Pl.'s Dep. at 37-39, 50, 65, 68-72.)  Ms. Lang gave Plaintiff FMLA forms related to her need to take time off to either care for or find a caregiver for her mother-in-law.  Ms. Lang did not give her FMLA forms related to the anticipated surgery on her ankle.  Plaintiff testified that she expressed concern to Ms. Lang about this, and Ms. Lang told her that this was all she needed, that the time she planned to take off for her ankle surgery would be considered FMLA leave and not short-term disability.  This made no sense to Plaintiff because the last time she was off for her injured ankle she

9

received short-term disability benefits, and it was Plaintiff's understanding that FMLA leave was without pay. (Pl.'s Dep. at 39-42, 66, 68-72.)

Plaintiff testified that she went back to Ms. Lang's office after she got the FMLA paperwork on May 12, 2010, and asked again about the paperwork she needed for time off in connection with her anticipated ankle surgery. Ms. Lang told her that she had all the paperwork she needed, but Ms. Lang never gave her any FMLA forms for her own medical condition. Each time Plaintiff asked for the paperwork she would need for her short-term disability, i.e., ankle surgery and recuperation, Ms. Lang kept telling her that she did not need that paperwork and that the FMLA paperwork she had was all she needed to secure her job at Defendant Telcom. (Pl.'s Dep. at 42-46, 66.) Plaintiff was confused because she recalled that the last time she was out for her ankle she was on short-term disability rather than just FMLA leave because she got paid. (Pl.'s Dep. at 59-66.) Plaintiff followed up with Ms. Lang on May 12, 2010 because she wanted some clarification why any leave she took for her anticipated ankle surgery had to be FMLA leave and not short-term disability. The only response she got from Ms. Lang was that the FMLA papers she had regarding time off to either care for or obtain care for her mother-in-law was all Plaintiff needed to secure her job after taking a leave of absence. (Pl.'s Dep. at 68-72.)

### E. Plaintiff's Discipline and Termination - May 17 and 18, 2010

On May 10, 2010, Ms. Lang sent an email to all employees of Defendant Telcom informing them of a mandatory meeting to be held off-site on Tuesday, September 21, 2012. It reminded employees not to make any vacation plans for that day. (Pl.'s Resp., Ex. 8, 5/10/10 email.) Plaintiff testified that her discipline and termination were triggered

by a question she directed to her supervisor, Ms. LeSage, asking what would happen to her if she were unable to attend this mandatory meeting.  (Pl.'s Dep. at 30-31, 36.)

On May 17, 2010, Plaintiff  had tests scheduled for May 25, 2010 in connection with her left ankle.  As discussed above, she had been having problems with her ankle, had discussed additional surgery on her ankle with Dr. Adelman, was told by Dr. Adelman that she would probably have to have surgery, and believed that Dr. Adelman would schedule surgery after the tests he ordered were completed.  (Pl.'s Dep. at 30-32, 35-36.)  Before that date, Plaintiff had discussed all this with Ms. LeSage and Ms. Lang in Human Resources.  (Pl.'s Dep. at 36-38.)

With all of this on her mind, on May 17, 2010, Plaintiff was in the middle of Defendant's call center and directed a question to her supervisor, Ms. LeSage, about what would happen if she was unable to attend the mandatory meeting scheduled for September 21st because she had to have surgery.  (Pl.'s Dep. at 30-31, 36.)  Ms. LeSage responded that the meeting was mandatory.  (LeSage Dep. at 23; Pl.'s Aff. at ¶ 33.)

Plaintiff denies that she had an "outburst" as Ms. LeSage and Ms. Lang claim.  Rather, Plaintiff testified that it was a slow morning, and she never raised her voice when she asked her supervisor about this mandatory meeting.  She said people in the call center often voiced questions, opinions, or complaints in a similar manner and did not receive a written warning like Plaintiff did on May 17, 2010.  (Pl.'s Dep. at 72-74, 76-77, 82-84, 105-109.)  In support, Plaintiff presents the deposition testimony of other call center employees who were present and heard her on May 17, 2010.  Co-worker, Angel Stephenson testified that Plaintiff was not disruptive when she asked Ms. LeSage the question about the September mandatory meeting and further testified that Plaintiff's conduct was no different than that

11

of other call center employees who had not been disciplined.  (Pl.'s Resp., Ex. 10, A. Stephenson Dep. at 7-8.)  Co-worker Debra Trent testified that, although present, she did not hear anyone ask a question on May 17, 2010 about the September mandatory meeting, she never experienced Plaintiff being disruptive in the call center in May 2010, but she did recall Plaintiff being upset and saying to her that Defendant Telcom could not make the September meeting mandatory.  (Pl.'s Resp., Ex. 10, D. Trent Dep. at 5-7.)  Co-worker Debra Arquette testified that she did not recall Plaintiff asking a question in May 2010 about the mandatory meeting, did not experience Plaintiff being disruptive in the call center, but knew Plaintiff was not happy about the mandatory meeting.  (Pl.'s Resp., Ex. 10, D. Arquette Dep. at 5-6.)  Co-worker Wendy Zografos testified that she did not recall Plaintiff asking in May 2010 about the mandatory meeting, and the only time she recalled Plaintiff being disruptive in the call center occurred about one month earlier when a caller wanted some fees waived and Supervisor LeSage told Plaintiff to do it.  (Pl.'s Resp., Ex. 10, W. Zografos Dep. at 5-6.)

Defendant presents an entirely different version of these facts.

Ms. LeSage testified that Plaintiff did not ask a question.  Rather, she had an "outburst" that lasted a couple of minutes, was pacing through the call center, loudly refusing to attend and saying they couldn't make her go and "Oh, hell no, I'm not going," and was disrupting others in the call center.  Ms. LeSage also claims that Plaintiff never said why she was refusing to attend the mandatory meeting.  LeSage told Plaintiff to sit down and be quiet, that everyone had to attend, and that she was behaving inappropriately. She claims Plaintiff was loud enough to be heard by the entire call center staff and most likely by adjourning departments.  (LeSage Dep. at 20-24.)

12

Ms. LeSage then went to see Ms. Lang in Human Resources about taking disciplinary action against Plaintiff.  Ms. Lang prepared a written warning letter.  Ms. LeSage had an opportunity to review the letter before it was presented to Plaintiff.  Ms. Lang from Human Resources then set up a meeting with Plaintiff to administer the written warning.  (LeSage Dep. at 23-25.)  The written warning was dated May 17, 2010 and from Jane LeSage.  It provided the following:

> Today you had an outburst in the middle of the department regarding the mandatory company-wide get together in September.  It was disruptive to your fellow employees as well as other departments.  This is the second time in a month that you have loudly complained and disturbed others.[2]

> Our Member Service Promises are what Telcom Credit Union stands for.  These promises are for our internal and external members.

> Should there be another disruption like this again, you will receive further disciplinary action up to and including termination.

(Def.'s Mot., Ex. D, 5/17/10 LeSage memo to Pl.)  The memo concluded with a signature and date line for Plaintiff and for her supervisor Ms. LeSage.  (*Id.*)

Now back to Plaintiff's version of the facts.

---

[2]The earlier instance referenced occurred in late April 2010 when Plaintiff was upset that Ms. LeSage would not handle a call from a customer that wanted to talk to a manager about waiving some overdraft fees and instead told Plaintiff to just waive the fees.  The email states that LeSage was concerned with Plaintiff's response to the member, telling him to call in the future and complain and he'll probably get the fees back again; told her this was destructive to the department and co-workers; acknowledged that some members can get under your skin but not to take it personal and not to get angry.  Unlike other verbal warnings Plaintiff had received, this email was not titled "verbal warning," and was not generated by Defendant's Human Resources Department.  In fact, after Plaintiff was terminated, Ms. Lang had to request a copy of the email from Ms. LeSage.  (Def.'s Mot., Ex. C, LeSage 4/26/10 email to Pl. re "Member on Friday"; Pl.'s Resp., Ex. 11, Lang 5/21/10 email to LeSage requesting copy of email to Pl.; and Pl.'s Dep. at 75.)

Around 11:00 a.m., after Plaintiff asked Ms. LeSage what would happen if she was unable to attend the mandatory September meeting, she resumed her work in the call center.  Then, around 3:00 p.m. that afternoon, Plaintiff was summoned to a meeting with Ms. LeSage and Ms. Lang where she was told that she was being written up for the question she had asked Ms. LeSage in the call center.  Plaintiff told them that she disagreed with the statement that she had an "outburst," told Ms. LeSage and Ms. Lang that she would respond to the written warning, and had intended to prepare a rebuttal but was sent home before she could do so.  At the end of the disciplinary meeting, Plaintiff told Ms. LeSage and Ms. Lang that if it was their intent to terminate her, she preferred that they do it in the morning rather than at the end of the day.

Plaintiff testified that she believed that she was about to be terminated because she had asked questions about taking time off for her anticipated ankle surgery and recuperation and was not getting a clear answer from Ms. Lang on her requests about FMLA leave versus short-term disability.  The last time she tried to get some clarity on that issue was on May 12th and now, five days later, she was getting a written warning for just asking her supervisor a question about a mandatory meeting.  She had never been written up for anything like this before.  Plaintiff also believed that she was going to be terminated because Ms. Lang had recently asked Plaintiff why she parked in a handicapped spot right before the police came out to check her license plate in the office parking lot and had asked other questions about how long ago she had injured her ankle.  Plaintiff felt that Ms. Lang had a problem with her ankle disability because of the questions she asked about Plaintiff's disability and because Ms. Lang was short with Plaintiff when she asked questions about obtaining short-term disability in connection with her anticipated leave for surgery on her

14

ankle. (Pl.'s Dep. at 76-87, 90-91, 98, 105-106.) Ms. Lang testified that she was not aware that Plaintiff had an ankle disability or any problems with her foot and denied that Plaintiff ever requested FMLA leave for her own medical condition. (Lang Dep. at 19, 34.)

Plaintiff also believed she was going to be terminated because of the way the conversation went during the May 17, 2010 disciplinary meeting. She was talked to as if she were a two-year old. She repeatedly told Ms. LeSage and Ms. Lang that she simply asked a question of her supervisor as she was supposed to, that it was not typical to go off and ask questions privately, that she never raised her voice, and that she did not have an outburst. She did not understand why she was being written up for asking her supervisor a question about what would happen if she could not attend the mandatory meeting because she had surgery on her ankle. She testified that other call center employees asked questions, stated opinions, and made complaints similar to the way she did but they were not disciplined. (Pl.'s Dep. at 82-84, 105-109.) Plaintiff's supervisor, Ms. LeSage, confirmed that Defendant had an "open door" policy that encouraged employees to freely ask questions of anyone superior to them, including the company president. (LeSage Dep. at 32-33.)

After Plaintiff left the May 17, 2010 disciplinary meeting, she went back to her desk in the call center. She was sent home early. (Pl.'s Dep. at 77.)

Plaintiff returned to work on May 18, 2010. She was immediately told that Ms. Lang wanted to see her and was instructed to go to the office of the department manager, Mr. Craig Larson. When she arrived in Mr. Larson's office, he left and returned with Ms. Lang. Ms. Lang told Plaintiff that she was no longer an adequate fit for Telcom Credit Union. Plaintiff surrendered her keys, and Mr. Larson accompanied Plaintiff downstairs so she

15

could clean out her desk before she left.  (Pl.'s Dep. at 24-26.)  Plaintiff did not understand

why she was being terminated when the written warning she had received the day before

stated that she would be terminated if there were any more occurrences and there were

none.  (Pl.'s Dep. at 90-91.)

Now for Defendant's version of these events.

The May 17, 2010 discipline meeting was held in Defendant's Human Resources

conference room.  Ms. LeSage and Ms. Lang discussed with Plaintiff why she was being

issued a written warning.  She was told that her behavior was inappropriate and that her

outburst had disrupted an entire department.  Ms. LeSage testified that, after first sitting

down and listening to Ms. Lane, Plaintiff jumped up, became very enraged, had another

outburst and stated that she was not going to listen anymore, that she was not going to

stay in there and to just give her the paper to sign.  Ms. LeSage claimed that Plaintiff ripped

the papers off the table, out of people's hands, and said let me sign this and "I'm out of

here."  (LeSage Dep. at 25-28.)  She also claimed that Plaintiff told her and Ms. Lang that

if they were going to fire her then they should do so in the morning and not to wait until at

night, and then stormed out of the room.  Ms. LeSage and Ms. Lane determined that this

was insubordination because it was "very un-businesslike" and unacceptable behavior and

that Plaintiff would be fired.  Ms. Lang made the decision to terminate Plaintiff and

communicated that to Ms. LeSage.  Ms. LeSage then went back to her desk and resumed

working.  Some time that day, Ms. Lang told Ms. LeSage that a decision had been made

to terminate Plaintiff.  (LeSage Dep. at 28-31.)

Ms. Lang testified that Ms. LeSage notified her on May 17, 2010 that Plaintiff had an

outburst during the work day.  Ms. LeSage told her she had previously given Plaintiff a

16

verbal warning about an earlier outburst and now wanted Ms. Lang to prepare a written warning to Plaintiff regarding her outburst on May 17th about the September mandatory employee celebration/training meeting that Ms. Lang was coordinating. Ms. LeSage told Ms. Lang that Plaintiff stood up and yelled "No, I'm not. They can't make me go. I'm not going to this meeting." (Lang Dep. at 22-23.) Ms. LeSage said that Plaintiff was loud and other call center employees were on the phone with members. (*Id.*)

Ms. Lang prepared a disciplinary memo, and then had a sit-down meeting with Ms. LeSage and Plaintiff. Plaintiff was very belligerent at the meeting and was not happy to be getting the written warning. Ms. Lang claims that Plaintiff basically grabbed it and said, "Here, I'll sign it right now," and then said "Is this meeting over? I'm leaving." (Lang Dep. at 25.) Ms. Lang told Plaintiff to wait so she could make a copy, left the room, returned, gave a copy to Plaintiff, who then got up and said "Just so you know, if you're going to terminate me, do it in the morning, not at the end of the day." (*Id.*)

After Plaintiff left the May 17th meeting, Ms. Lang suggested to Ms. LeSage that they go and talk to her department manager, Craig Larson, and let him know what had just happened. Ms. LeSage and Ms. Lang talked with Mr. Larson. Ms. Lang and Mr. Larson then went to Defendant's CEO, Thomas Reagan, and told him that they felt Plaintiff's actions were insubordinate and they wanted her terminated, and Mr. Reagan agreed with their decision. (Lang Dep. at 26.) Ms. Lang explained that the insubordination that justified Plaintiff's termination was "[t]he fact that she wouldn't even just sit down and allow us to go over the disciplinary action. She grabbed it, the sheet of paper, and went to sign it and basically stood up and wanted to end the meeting before the meeting was ended, that coupled with her parting statement about when to terminate her, we felt that was

17

insubordinate."  Ms. Lang further explained that Plaintiff grabbed the paper because she wanted to sign it.  (Lang Dep. at 27-28.)

Plaintiff was terminated on May 18, 2010.

On May 13, 2011, she filed this lawsuit against Defendant alleging that Defendant violated her rights under (1) the FMLA when it both interfered with her FMLA rights and retaliated against her when she sought to enforce those rights; (2) Michigan's Persons With Disabilities Civil Rights Act when it disciplined and terminated her because of her disability; and (3) Michigan's public policy when it wrongfully terminated her in retaliation for her attempt to enforce her FMLA rights.  This matter is now before the Court on Defendant's motion for summary judgment.

## II.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A moving party may meet that burden "by 'showing' – that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  Revised Rule 56 expressly provides that:

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

18

Fed. R. Civ. P. 56(c)(1).  The revised Rule also provides the consequences of failing to properly support or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike County Bd. Of Education*, 286 F.3d 366, 370 (6th Cir. 2002).

## III.   Analysis

Defendant asserts that Plaintiff was terminated on May 18, 2010 for her insubordinate and belligerent behavior during a counseling session when she received a written warning for the incident that occurred on May 17, 2010.  (Def.'s Mot. at 1.)   Defendant's motion argues that it is entitled to summary judgment on each of Plaintiff's claims.  As to Plaintiff's

19

claims of discrimination under Michigan's Persons With Disabilities Civil Rights Act ("PWDCRA"), Defendant argues that Plaintiff (1) cannot establish a prima facie case of discrimination under that Act because (a) she cannot show she suffered from a disability as defined by the PWDCRA, (b) she cannot show that a decisionmaker knew she had a disability, and (c) cannot establish a causal connection between her termination and her alleged request for FMLA leave; and (2) cannot show that Defendant's proffered, legitimate reason for her termination was a pretext for disability discrimination. As to Plaintiff's claims that Defendant violated the FMLA when it both interfered with her FMLA rights and retaliated against her when she sought to enforce those rights, Defendant argues that Plaintiff (1) cannot establish a prima facie case of retaliation under the FMLA because (a) she was seeking short-term disability, not FMLA leave for her ankle, and (b) she did not have a serious health condition that would qualify for FMLA leave; (2) cannot establish a causal connection between her alleged request for FMLA leave and her termination; and (3) cannot show that Defendant's proffered, legitimate reason for her termination was a pretext for retaliation for requesting FMLA leave. Finally, as to Plaintiff's claim that she was wrongfully discharged in violation of Michigan's public policy, Defendant argues that, because the FMLA provides a remedy for retaliation for requesting FMLA leave, this statutory remedy is her exclusive remedy for that alleged wrong.

For the reasons discussed below, this Court GRANTS Defendant's motion as to Plaintiff's violation of Michigan public policy claim. It DENIES Defendant's motion as to Plaintiff's PWDCRA claim and Plaintiff's claims of FMLA interference and FMLA retaliation. The Court begins with an analysis of Plaintiff's FMLA claims.

### A.  FMLA Claims

"The FMLA makes it unlawful for any employer 'to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the Act],' 29 U.S.C. § 2615(a)(1), or to 'discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the Act].'  *Id.* at § 2615(a)(2)."  *Seeger v. Cincinnati Bell Tel. Co., LLC,* ___ F.3d ___, 2012 WL 1592670, *6 (6th Cir. May 8, 2012). "Consistent with these proscriptions, '[e]mployers may not discriminate against employees on FMLA leave in the administration of their paid leave policies.'"  *Id.* (quoting 29 C.F.R. § 825.207(a)).

Plaintiff alleges that Defendant violated the FMLA both by interfering with her attempt to exercise her FMLA rights and by retaliating against her for that attempt.  The Sixth Circuit recognizes these "two discrete theories of recovery under the FMLA:  (1) the so-called 'interference' or 'entitlement' theory arising from § 2615(a)(1), and (2) the 'retaliation' or 'discrimination' theory arising from § 2615(a)(2)."  *Id.*  "[T]he requisite proofs differ" for interference and retaliation claims.  *Id.*  The primary distinction is that employer intent is not considered in an interference claim.  "The interference theory has its roots in the FMLA's creation of substantive rights, and '[i]f an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred,' regardless of the intent of the employer."  *Id.* (quoting *Arban v. West Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003)).  The opposite is true of FMLA retaliation claims.  "The central issue raised by the retaliation theory, on the other hand, is 'whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory

21

reason.'"  *Id.* (quoting *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006)).  "In contrast to the interference theory, '[t]he employer's motive is relevant because retaliation claims impose liability on employers that act against employees specifically *because* those employees invoked their FMLA rights.'"  *Id.* (quoting *Edgar*, 443 F.3d at 508).

### 1.  Plaintiff's FMLA Interference Claim

"Employees invoking the entitlement theory must prove that their employer interfered with or denied them an FMLA benefit to which they were entitled.  This inquiry is an objective one divorced from the employer's motives, with the central question being simply whether the employee was entitled to the FMLA benefits at issue."  *Edgar*, 443 F.3d at 511 (internal citations omitted).  To prevail on her interference or entitlement claim, Plaintiff must "prove that:  (1) she was an eligible employee," (2) Defendant "was an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled."  *Id.* at 507.  "Both the [FMLA] statute and the DOL regulations likewise establish that interference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct."  *Id.* at 508.

Defendant's motion addresses only Plaintiff's FMLA retaliation claim, not her FMLA interference claim.  Some of Defendant's arguments, however, apply to Plaintiff's interference claim, i.e., that Plaintiff was not entitled to FMLA leave because her claim that her doctor told her she would need additional surgery on her ankle was not supported by his medical notes, that Plaintiff notified her employer that she wanted short-term disability

22

benefits for the time she anticipated she would be off for ankle surgery and recuperation but did not seek FMLA leave, that her employer never denied any FMLA request, and Defendant had a legitimate reason unrelated to Plaintiff's alleged exercise of her FMLA rights to discipline and terminate her.  There is no dispute as to the first two elements of Plaintiff's prima facie FMLA interference claim, i.e., that Defendant is an employer under the FMLA, and Plaintiff was an eligible employee under the FMLA.

Taking the facts in the light most favorable to Plaintiff, she has created a factual dispute on the remaining elements of her prima facie FMLA interference claim, i.e., whether she was entitled to FMLA leave, whether she sought FMLA leave as well as short-term disability for the time she anticipated she would have to take off for additional surgery on her ankle and recuperation, whether her employer interfered with her attempt to exercise her FMLA rights in connection with her anticipated ankle surgery, and whether Defendant's discipline and termination were for a legitimate reason unrelated to Plaintiff's attempt to exercise her FMLA rights.

First, although Dr. Adelman's notes did not reflect in March or May 2010 that additional surgery on Plaintiff's ankle was scheduled or contemplated, Plaintiff testified otherwise and Dr. Adelman likewise testified that the conversation could have occurred because he does not document in his notes every conversation that he had with a patient otherwise he'd "be dictating all day."  (Dr. Adelman Dep. at 31-32, 34, 36.)  He admitted that "[t]here's a lot more discussion on stuff than is usually reflected in a note, so I mean, there's a strong possibility.  If she said we did, I mean, I wouldn't be – I wouldn't doubt myself and say, 'No, we absolutely didn't.'"  (Dr. Adelman Dep. at 31-32.)  When asked if,

23

after Plaintiff's May 10, 2010 visit with him, "she was in a position to know that she needed a Family Medical leave for surgery at that time," Dr. Adelman responded "[i]f we had discussed it, you know, even though it's not documented, she may have looked into that, I'm sure."  (Dr. Adelman Dep. at 35-36.)

Second, although disputed, Plaintiff testified that she repeatedly told both her supervisor, Ms. LeSage, and Ms. Lang in Human Resources that she anticipated that she would need time off from work for additional surgery on her ankle and for recuperation. Plaintiff presents evidence that Defendant's Employee Handbook requires at least 30 days' notice in advance of taking FMLA leave.  (Pl.'s Resp., Ex. 5, Employee Handbook at 31-33.)  That Plaintiff was confused whether she could obtain short-term disability benefits for the time she was off as opposed to just obtaining unpaid FMLA leave does not preclude her request from being considered as one for FMLA leave.  As the Sixth Circuit has observed, "[a]n employee does not have to expressly assert his right to take leave as a right under the FMLA."  *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 723 (6th Cir. 2003) (internal quotation marks and citation omitted).   "[A]n employee gives his employer sufficient notice that he is requesting leave for an FMLA-qualifying condition when he gives the employer enough information for the employer to reasonably conclude that an event described in the FMLA § [2612(a)(1)] has occurred."  *Id.* at 723-24 (internal quotation marks and citation omitted).  Moreover, as the Sixth Circuit recently observed in *Seeger*, "[t]he FMLA does not preclude employers from offering employees paid medical-leave benefits in tandem with FMLA unpaid leave; in fact, an employer may require an eligible employee to substitute accrued paid leave for unpaid FMLA leave, with such paid leave to run

24

concurrently with the FMLA leave." *Seeger*, ___ F.3d at ___, 2012 WL 1592670 at *6. Plaintiff testified that she repeatedly asked Ms. Lang about paid medical-leave benefits under Defendant's short-term disability plan, but Ms. Lang refused to clarify why short-term disability benefits were unavailable to her and that the time she anticipated she would need to take off for her ankle surgery would be considered only as unpaid FMLA leave.  Plaintiff also testified that Ms. Lang repeatedly told her that she had all the FMLA paperwork she needed even though that paperwork had nothing to do with time she anticipated she would need to take off related to her own medical condition.  So, construing the facts in the light most favorable to Plaintiff, she has created a factual dispute on the remaining elements of her prima facie FMLA interference claim.

To defeat Defendant's motion for summary judgment on her FMLA interference claim, "Plaintiff must also create a factual dispute" as to whether the interference with her attempt to exercise her FMLA rights "was based on a legitimate business reason." *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 841 (6th Cir. 2012).  "If Defendant proffers such a justification, then Plaintiff may seek to rebut it by showing, among other things, that the excuse was insufficient to warrant the challenged conduct." *Id.*  A plaintiff can do this "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Grace v. USCAR*, 521 F.3d 655, 670 (6th Cir. 2008) (internal quotation marks and citation omitted).

Plaintiff presents evidence of two instances where she claims Defendant interfered with her attempt to exercise her FMLA rights in connection with anticipated surgery on her

25

ankle: (1) Ms. Lang's refusal to clarify Plaintiff's right to short-term disability as opposed to just unpaid FMLA leave and her repeated assurances to Plaintiff that the FMLA form she had regarding time off for care of her mother-in-law was all she needed even though she also told Ms. Lang that she needed time off for her anticipated ankle surgery; and (2) her termination. As to the first instance, Defendant simply denies that Plaintiff ever asked for FMLA leave and thus denies that it ever interfered with any attempt on her part to exercise her FMLA rights. As discussed above, Plaintiff presents evidence showing that the facts are otherwise. Plaintiff also presents evidence that Ms. Lang's interference with her attempt to exercise her FMLA rights was motivated by her bias against Plaintiff because of her ankle disability as opposed to Defendant's claim that Plaintiff only sought short-term disability benefits and not FMLA leave.

As to the second instance, Defendant proffers a legitimate business reason for her termination – that Plaintiff was insubordinate and belligerent during the May 17, 2010 counseling session when she received a written warning for the "outburst" Ms. LeSage claimed had occurred earlier that same day. Plaintiff, in response, presents evidence that creates a factual dispute as to whether the interference with her attempt to exercise her FMLA rights was based on a legitimate business reason. Considering the evidence in the light most favorable to Plaintiff, she shows that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct. The evidence Plaintiff presents creates a factual dispute as to whether her behavior in the call center on May 17, 2010 was sufficient to warrant a written warning; whether Plaintiff had an outburst in the call center of May 17, 2012 that

was disruptive to her fellow call center workers and employees in other departments as described in her written warning, whether her behavior at the May 17, 2012 discipline meeting with Ms. LeSage and Ms. Lang warranted a departure from the progressive disciplinary steps outlined in Defendant's Employee Handbook (Def.'s Reply, Ex. P, Empl. Handbook at 13), whether her behavior in that meeting actually motivated Ms. Lang's decision to recommend that Plaintiff be immediately terminated, and whether Ms. Lang's decision was instead motivated by her bias against Plaintiff because she was disabled from her earlier ankle injury.   (*See generally* Pl.'s Dep. testimony cited above; Co-worker deposition testimony cited above; and Def.'s Employee Handbook sections cited above.)

For the above reasons, Plaintiff's FMLA interference claim survives Defendant's motion for summary judgment.  The Court now addresses Plaintiff's FMLA retaliation claim.

### 2.  FMLA Retaliation Claim

Plaintiff claims that she was retaliated against for attempting to exercise her FMLA rights when she received a written warning on May 17, 2010 and then terminated on May 18, 2010.  Unlike FMLA interference claims, Defendant's motivation for disciplining and terminating her is relevant.  "The central issue raised by the retaliation theory . . . is whether the employer took the adverse action because of a prohibited reason or for a legitimate, nondiscriminatory reason."  *Seeger*, ___ F.3d at ___, 2012 WL 1592670 at *6 (internal quotation marks and citation omitted).

Because it is based on circumstantial, as opposed to direct evidence, Plaintiff's FMLA retaliation claim "is evaluated under the familiar *McDonnell Douglas* burden-shifting

27

framework." *Seeger*, ___ F.3d at ___, 2012 WL 1592670 at *7. "To establish a prima facie case of retaliation under the FMLA, [Plaintiff] must show that: (1) [s]he was engaged in statutorily protected activity; (2) [Defendant] knew that [s]he was exercising [her] FMLA rights; (3) [s]he suffered an adverse employment action; and (4) a causal connection existed between the protected FMLA activity and the adverse employment action." *Id.* "The burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Id.* (internal quotation marks and citation omitted).

The parties dispute each element but the third -- they agree that Plaintiff suffered an adverse employment action. As to the other elements, Defendant argues that (1) Plaintiff cannot show that she was engaged in statutorily protected activity because (a) she requested short-term disability benefits and not FMLA leave, and (b) even if she did request FMLA leave, at the time she did so she did not have a serious health condition; (2) Defendant was not aware that Plaintiff was exercising her FMLA rights; and (3) Plaintiff cannot establish a causal connection between her alleged request for FMLA leave and her termination because temporal proximity alone is insufficient.

Defendant's first two arguments are discussed above. Taking the facts in the light most favorable to Plaintiff, this Court reiterates that she has created a factual dispute as to these elements. The only element left to address is that requiring proof of a causal link between Plaintiff's protected FMLA activity and her discipline and termination. The Sixth Circuit's recent decision in *Seeger* is instructive. It held that "the nearness in time" between

the plaintiff's exercise of FMLA rights and his termination – three weeks in *Seeger* – "suffices . . . to meet the low threshold of proof necessary to establish a prima facie case of retaliatory discharge." *Seeger*, ___ F.3d at ___, 2012 WL 1592670 at *8. The *Seeger* court acknowledged that the Sixth Circuit "'has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise.'" *Id.* (quoting *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004) and citing additional Sixth Circuit decisions). The *Seeger* court concluded that the plaintiff had "shown causality by a preponderance of the evidence through close temporal proximity that is suggestive of retaliation." *Id.* The same is true here. Plaintiff testified that she last spoke about her need for time off for her anticipated ankle surgery and recuperation with Ms. Lang of Defendant's Human Resources Department on May 12, 2012, and was disciplined five days later on May 17, 2012 and fired six days later on May 18, 2012. Just as in *Seeger*, Plaintiff has "shown causality by a preponderance of the evidence through close proximity that is suggestive of retaliation." *Id.*

Taking the next step in the *McDonnell Douglas* analysis, it is not disputed that Defendant has articulated a legitimate, nondiscriminatory reason for terminating Plaintiff – that she was insubordinate and belligerent during the May 17, 2012 meeting with Ms. LeSage and Ms. Lang where she was administered a written warning. The burden thus shifts to Plaintiff to present "adequate evidence demonstrating that [Defendant]'s proffered reason was a pretext for discrimination." *Id.* at *9. "'[A] reason cannot . . . be a pretext for

29

discrimination unless it is shown both that the reason was false, and that discrimination was the real reason.'" *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphases and quotation marks omitted)).

Plaintiff claims that she has met her burden because she presents evidence demonstrating that Ms. LeSage's version of what happened on May 17th in the call center and Ms. Lang's and Ms. LeSage's versions of what happened on May 18th at the meeting where she was administered a written warning are false. Plaintiff also presents evidence that she claims demonstrates that the real reason for her discipline and termination was retaliation against her for attempting to exercise her FMLA rights, i.e., close temporal proximity between her protected activity and the adverse employment actions; that Ms. LeSage knew her question about missing the mandatory September meeting was asked because she anticipated being out on FMLA leave; that Ms. Lang had recently asked her about parking in a handicapped spot in Defendant's parking lot right before the police arrived and verified that her license plates allowed her to do so; that Ms. Lang made other comments about her ankle disability like questioning her how long ago she injured her ankle; and Ms. Lang refused to explain why she could not take FMLA leave and simultaneously obtain short-term disability benefits during the time she anticipated she would have to take off for another ankle surgery and recuperation, and repeatedly told Plaintiff that the FMLA forms she had regarding time off to care for her mother-in-law was all she needed to secure her job even though these forms did not mention FMLA leave for her own medical condition.

Again, the recent decision in *Seeger* is instructive.  It clarifies that, although temporal proximity may be enough to establish a plaintiff's prima facie case of FMLA retaliation, the burden is heavier to show pretext.  "Unlike its role in establishing a prima facie case, the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext." *Id.* at *9 (internal quotation marks and citation omitted).  "A plaintiff may establish pretext by showing that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action." *Id.* "'Whichever method the plaintiff employs, he always bears the burden of producing sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant [ ] intentionally discriminated against him.'" *Id.* (quoting *Clark v. Walgreen Co.*, 424 F. App'x 467, 474 (6th Cir. 2011) (per curiam)).

Like the plaintiff in *Seeger*, Plaintiff here seeks to demonstrate pretext by showing that Defendant's proffered reasons for her written warning and termination have no basis in fact – that Defendant's explanation is "simply fabricated" and untrue.  As previously observed by the Sixth Circuit, this is "'essentially an attack on the credibility of the employer's proffered reason . . . [and] consists of showing that the employer did not actually have cause to take adverse action against the employee based on its proffered reason, and thus, that the proffered reason is pretextual.'" *Id.* (quoting *Joostberns v. United Parcel Serv., Inc.*, 166 F. App'x 783, 791 (6th Cir. 2006) and omitting internal citation).

The Court's inquiry as to pretext must also consider the Sixth Circuit's adoption of the "honest belief rule," because "[w]here the employer can demonstrate an honest belief in its proffered reason, . . . the inference of pretext is not warranted." *Joostberns*, 166 F. App'x

31

at 791.  "'[A]n employer's proffered reason is considered honestly held where the employer can establish it reasonably reli[ed] on particularized facts that were before it at the time the decision was made.'"  *Id.* (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, at 806-07 (6th Cir. 1998)).  The burden then shifts to the plaintiff "to demonstrate that the employer's belief was not honestly held."  *Id.*  "An employee's bare assertion that the employer's proffered reason has no basis in fact is insufficient to call an employer's honest belief into question, and fails to create a genuine issue of material fact."  *Id.*

Because Plaintiff argues that Defendant's legitimate, nondiscriminatory reason for its adverse employment actions are fabricated and untrue, her argument is essentially an attack on the credibility of Defendant's reason and the honest belief rule comes into play. The *Seeger* court set out the ground rules for applying the honest belief rule.  "A plaintiff is required to show more than a dispute over the facts upon which the discharge was based."  *Seeger*, ___ F.3d at ___, 2012 WL 1592670 at *10 (internal quotation marks and citation omitted).  "As long as the employer held an honest belief in its proffered reason, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless."  *Id.* (internal quotation marks and citations omitted). The *Seeger* court went on to caution, however, that "[a]n employer's invocation of the honest belief rule does not automatically shield it, because the employee must be afforded the opportunity to produce evidence to the contrary, such as an error on the part of the employer that is too obvious to be unintentional."  *Id.* (internal quotation marks and citation omitted).  In *Seeger*, the court viewed the evidence in the light most favorable to the plaintiff yet concluded that the defendant employer "made a <u>reasonably informed and considered</u>

decision before it terminated him, and [the plaintiff had] failed to show that [his employer]'s decision-making process was unworthy of credence." *Id.* (internal quotation marks and citation omitted) (emphasis added).

The plaintiff in *Seeger* had argued that his employer's investigation of his claimed need to remain on FMLA leave was inadequate and that he had always been a good and reliable employee.  The Sixth Circuit rejected those arguments, as did the district court, because the Sixth Circuit does not require that an investigation of an employee be "optimal" before taking an adverse employment action, see *id.* at *11, and the issue whether the plaintiff "was a reliable employee with a good employment record" is not relevant to the court's application of the "honest belief" rule.  *Id.*  As the *Seeger* court clarified, "[t]he determinative question is not whether [the plaintiff] actually committed fraud [reason for termination], but whether [his employer] reasonably and honestly believed that he did." *Id.*

Applying that reasoning here, the determinative question is not whether Plaintiff actually had an outburst in the middle of the call center on May 17, 2010 that disrupted her co-workers and whether she was belligerent and insubordinate during her May 17th meeting with Ms. LeSage and Ms. Lang.  Rather, the determinative question is whether Plaintiff's employer reasonably and honestly believed that Plaintiff was disruptive in the call center on May 17th and belligerent and insubordinate during the discipline meeting held later that day.

Unlike in *Seeger*, this Court cannot say that the record reflects that Defendant made a reasonably informed and considered decision before terminating Plaintiff.  Rather, Plaintiff presents evidence that calls into question whether Ms. LeSage's decision to pursue a

written warning related to Plaintiff's "disruptive behavior" in the call center on May 17th was reasonably informed.  Although the parties present the Court with deposition testimony from six of Plaintiff's co-workers, many of whom testified that Plaintiff was upset about the mandatory nature of the September meeting, only one testified that she found Plaintiff's discussion with Ms. LeSage about that meeting to be disruptive.  (Pl.'s Resp., Ex. C, Deps. of A. Stephenson, D. Trent, D. Arquette, W. Zografos; Def.'s Reply, Exs. M and N, Deps. of V. Alexandris and M. Azarovitz.)   Co-worker Vasiliki Alexandris found Plaintiff's conversation with Ms. LeSage to be upsetting to her because she believed that "[w]hen it's mandatory, you have to go," and because she believed it was wrong to "have someone talking against the company that gives you your daily bread and employs you. . . ."  (V. Alexandris Dep. at 9.)  This co-worker described the manner in which Plaintiff asked the question of Ms. LeSage as follows:

> A. It was like she was pushing – there are different ways to ask a question. When she was asking Miss LeSage, it was like she was pushing her to do something.
> Q. Okay.  Was it disruptive?
>
> A. Yes.

(V. Alexandris Dep. at 10.)  Apparently, Ms. LeSage's decision to obtain a written warning against Plaintiff for being disruptive to her co-workers was not informed by any co-worker interviews.

Even if the decision to issue a written warning could be found to be the result of a reasoned and honest belief, Plaintiff presents additional evidence that creates a factual

34

dispute whether the decision to terminate was reasonably informed and worthy of credence.

As to the May 17th decision to terminate, Plaintiff presents the following evidence suggesting that it was not a reasonably informed and considered decision. Deposition testimony reveals that, immediately after the May 17th meeting where Plaintiff's written warning was administered, Ms. Lang and Ms. LeSage agreed that Plaintiff should be fired because her conduct during that meeting was "very un-businesslike" and thus "insubordinate." (LeSage Dep. at 28-31.) Ms. LeSage and Ms. Lang then went to Ms. LeSage's manager, Craig Larson, and told him about the meeting and their conclusions. Ms. Lang and Mr. Larson then went to Defendant's CEO, Thomas Reagan, and told him that they felt Plaintiff's actions were insubordinate and that they wanted her terminated. (Lang Dep. at 25.) Without ever asking Plaintiff about that meeting or conducting any investigation, Defendant's CEO simply agreed with the decision to terminate Plaintiff the next day. Plaintiff testified that, when she was terminated on May 18th, she was only told that she was no longer an adequate fit for Defendant Telcom Credit Union. She did not understand why she was being terminated on May 18th when the written warning she had received the day before stated that she would be fired if there were further occurrences and there were none. (Pl.'s Dep. at 24-26, 90-91.) Plaintiff also presents evidence that suggests Defendant did not have an "honest belief" that she was insubordinate but rather knew Plaintiff was attempting to go out on an extended FMLA leave after surgery on her ankle and simply decided to retaliate and terminate her rather than allow her to do so. This takes Plaintiff's proofs far outside those presented by the Plaintiff in *Seeger*. Viewing the

35

evidence in the light most favorable to Plaintiff, this Court cannot conclude that Defendant made a "reasonably informed and considered decision" before it disciplined and then terminated Plaintiff.  Plaintiff here, unlike the plaintiff in *Seeger*, has presented evidence to allow a reasonable jury to conclude that Defendant's decision-making process was not worthy of credence.

Based on the above analysis, Plaintiff has created a genuine issue of material fact regarding whether Defendant retaliated against her for attempting to exercise her FMLA rights.  Plaintiff's FMLA retaliation claim thus survives Defendant's motion for summary judgment.

### C.   Plaintiff's PWDCRA Claim

Plaintiff also claims that Defendant violated Michigan's Persons With Disabilities Civil Rights Act ("PWDCRA") when it disciplined and terminated her because of her disability. Defendant's motion for summary judgment argues that Plaintiff cannot establish a prima facie case under the PWDCRA because Plaintiff cannot show that (1) she suffered a disability as defined under that Act; (2) as to the decision to terminate, the final decision-maker Thomas Reagan knew or have reason to known that Plaintiff had a disability; and (3) there is a causal connection between Plaintiff's alleged request for FMLA leave and her termination.

"[L]ike the ADA, the PWDCRA generally protects only against discrimination based on physical or mental disabilities that substantially limit a major life activity of the disabled individual, but that, with or without accommodation, do not prevent the disabled individual from performing the duties of a particular job."   *Peden v. City of Detroit*, 680 N.W.2d 857,

36

863 (Mich. 2004).  To establish a prima facie case under the PWDCRA, Plaintiff must show that (1) she is disabled "as defined in the act," (2) that her disability "is unrelated to [her] ability to perform [her] job duties, and (3) that [s]he has been discriminated against in one of the ways delineated in the statute."  *Id.* (internal quotation marks and citation omitted). Plaintiff's ability to establish each of these elements in challenged by Defendant.

As to the first two elements, "[d]isability" as defined in the PWDCRA, means "'[a] determinable physical or mental characteristic of an individual . . . if the characteristic: (A) . . . substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position . . .', (ii) '[a] history of [such a] determinable physical or mental characteristic . . . '; or (iii) '[b]eing regarded as having [such a] determinable physical or mental characteristic . . . .'"  *Id.* (quoting Mich. Comp. Laws § 37.1103(l)(i)).  ""Unrelated to the individual's ability' means, with or without accommodation, an individual's disability does not prevent the individual from . . . performing the duties of a particular job or position.'"  *Id.* (quoting Mich. Comp. Laws § 37.1103(l)(i)).

Michigan has adopted a three-pronged test used by the federal courts in ADA cases when determining whether a plaintiff has a disability.  First, the court is to consider whether the plaintiff has a physical impairment.  Next, it identifies the life activity that the plaintiff is relying upon and determines whether it is a major life activity.  Finally, the court asks whether the plaintiff's physical impairment "substantially limited the major life activity." *Chiles v. Machine Shop, Inc.*, 606 N.W.2d 398, 474 (Mich. 1999).

Despite Defendant's arguments to the contrary, Plaintiff presents evidence of a history of and a current physical impairment to her ankle that has substantially limited her major life activities like walking, running, climbing stairs, pushing, lifting, standing for prolonged periods of time, and sitting for prolonged periods of time. (Pl.'s Dep. at 37, 87, 95-97; Dr. Adelman's Dep. at 24-29.)  Despite her ankle impairment, Plaintiff's supervisor, Ms. LeSage, testified that Plaintiff's physical difficulties did not interfere with her job performance. (LeSage Dep. at 15-17.)  Taking the facts in the light most favorable to Plaintiff, she has created a factual dispute on the first element of her prima facie PWDCRA claim.

As discussed above, Plaintiff also presents ample evidence that Ms. LeSage and Ms. Lang knew about her ankle disability.  She also presents some evidence that Mr. Larson and Mr. Reagan also knew or should have known about her ankle disability. (Pl.'s Aff. at ¶¶ 15-16; Pl.'s Dep. at 16; Lang Dep. at 26.)

In addition to evidence as to who knew or should have known of her disability, Plaintiff presents evidence that Ms. Lang and Ms. LeSage were involved in the decision to terminate Plaintiff. (Pl.'s Resp., Ex. 12, Kuhn Aff. stating that Def.'s Ans. to Pl.'s Interrog. No. 11 from Pl.'s 1st set confirms that Ms. Lang, Ms. LeSage, Manager Craig Larson and CEO Thomas Regan were all involved in the decision to terminate Plaintiff.)  Deposition testimony from Ms. LeSage and Ms. Lang likewise confirms that Ms. Lang in particular was involved in all aspects of the decision to terminate Plaintiff.  Although Mr. Reagan may have been the ultimate decisionmaker, recent case law supports Plaintiff's argument that the evidence she presents is sufficient to show a causal nexus between Ms. Lang's

38

discriminatory animus towards her disability and Mr. Reagan's ultimate decision to terminate Plaintiff. *See Staub v. Proctor Hospital*, ___ U.S. ___, 131 S. Ct. 1186, 1194 (2011) (discussing the "cat's paw" theory of liability in the context of a USERRA claim of antimilitary discrimination and holding that "if a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable. . . ."); *Davis v. Omni-Care, Inc.*, ___ F.3d ___, 2012 WL 1959367, *7 (6th Cir. June 1, 2012) (discussing *Staub* and holding that "for purposes of Title VII cases, if a supervisor acts with a discriminatory or retaliatory animus, and the act is intended to cause, and is a proximate cause of, the ultimate employment action, the employer is liable under the 'cat's paw' theory."). Thus, viewing the evidence in the light most favorable to Plaintiff, Plaintiff here, like the plaintiff in *Staub*, provides evidence from which a reasonable jury may infer Ms. Lang knew about Plaintiff's disability, was involved in the decision to terminate her, and that Ms. Lang's urging that Plaintiff be terminated was motivated by discriminatory animus.

Defendant also argues that Plaintiff cannot show that the legitimate, nondiscriminatory reason it gave for disciplining and terminating her was pretext for unlawful discrimination. For all the reasons discussed above, viewing the evidence in the light most favorable to Plaintiff, she has created a genuine issue of material fact regarding whether Defendant discriminated against her because of her disability in violation of the PWDCRA. Plaintiff's PWDCRA claim thus survives Defendant's motion for summary judgment.

### D. Plaintiff's Claim of Wrongful Discharge In Violation of Public Policy

In Count III of her complaint, Plaintiff asserts that Defendant violated Michigan's public policy when it wrongfully terminated her in retaliation for attempting to exercise her FMLA rights.  In its motion, Defendant relies on a recent decision from this Court that dismissed a similar claim and persuasively argues that this claim cannot survive "if there is already a statutory remedy covering a particular public policy concern."   *Murray v. Dawn Foods*, No. 09-cv-12160, 2010 WL 4063731, *1 n.1 (E.D. Mich. Oct. 14, 2010) (Murphy, J.) (granting the defendant's motion for summary judgment as to the state-law wrongful termination claim "[b]ecause the ADA covers the filed of disability discrimination" and citing cases).  Plaintiff's Response does not address this claim; and at the June 13, 2012 hearing, Plaintiff's counsel informed the Court that this claim was being abandoned.  Accordingly, Defendant's motion is GRANTED as to this claim.

## IV.   Conclusion

For the above stated reasons, Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART.  It is GRANTED as to Plaintiff's "wrongful termination" in violation of Michigan public policy claim, and is DENIED as to Plaintiff's PWDCRA and FMLA claims.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  June 19, 2012


I hereby certify that a copy of the foregoing document was served upon counsel of record on June 19, 2012, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager